683 P.2d 296

Elia NAVA, surviving parent of Armando Nava, on her own behalf, Plaintiff/Appellant,

v.

TRULY NOLEN EXTERMINATING OF HOUSTON, INC., a foreign corporation, Defendant/Appellee.

No. 2 CA–CIV 4804.

Court of Appeals of Arizona, Division 2.

Jan. 19, 1984.

Review Denied June 5, 1984.

498

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by John F. Molloy and Daniel F. Davis, Tucson, for plaintiff/appellant.

Snell & Wilmer by H. William Fox, Phoenix, for defendant/appellee.

## OPINION

HATHAWAY, Judge.

This appeal was taken from the judgment notwithstanding the verdict entered by the trial court in favor of defendant/appellee Truly Nolen Exterminating of Houston, Inc. (Truly Nolen) in the underlying wrongful death action. The action arose out of the death of appellant's son, Armando Nava, in the crash of an airplane owned by Truly Nolen. Viewed in a light most favorable to upholding the jury's verdict, *Gage v. Kuhlmeier*, 132 Ariz. 465, 646 P.2d 896 (App.1982), the pertinent facts are as follows.

The airplane was purchased by Truly Nolen in 1975 for the purpose of transporting people in connection with the corporation's business. In August or September of 1979, the tail section of the airplane was damaged as it was being taxied from its parking position by Truly Nolen, president of the corporation (Nolen). Nolen engaged the services of Alex Apodaca, a federally licensed aircraft and power mechanic and inspector to repair the airplane. Apodaca was then employed by Tucson Commander, Inc., but in February 1980 he set up his own business and performed the tail section repairs for Truly Nolen. These repairs necessitated the replacement of the aircraft's elevators, which Apodaca ordered as

an assembly from the airplane's manufacturer and installed. As it became apparent that the repairs would take several months, Truly Nolen purchased a replacement aircraft and engaged the services of Skip Cregier to switch the engines on the two planes. Cregier's work was completed and he was paid by Truly Nolen in December 1979. On March 6, 1980, at the request of Nolen, Arizona Frontier Avionics was hired to check the avionics on the aircraft.

After the tail section repairs were completed, Apodaca advised Nolen that a test flight should be conducted. Apodaca recommended that Cregier perform the test flight, and Nolen gave his approval. Cregier flew the plane on March 11 without incident, but advised Apodaca that there was a slight oil leak on one of the engines, which Apodaca caused to be repaired. The March 11 flight was the first time the plane had been flown since the engines had been replaced in December. Apodaca billed Truly Nolen for his repair work and Cregier's test flight, and in turn paid Cregier. The invoice of Arizona Frontier Avionics, which was admitted into evidence, indicated that a test flight was needed to check out the plane's avionics, and Cregier advised Apodaca and his son that he would take the plane up for this purpose on March 14. Nolen testified that although he did not speak with Cregier between March 11 and 14, he was advised by someone at Apodaca's business that Cregier would be flying the plane on March 14.

Sometime around 4 p.m. on March 14, Nolen came out to Apodaca's hangar to fly the plane himself. There is no evidence as to whether Nolen knew that Cregier had not yet made the second test flight. Nolen testified that he began his preflight inspection of the plane, but when he realized that one of the fuel tanks was not full, he decided not to wait to fill it up, stopped his inspection and left. Almost immediately thereafter, Cregier arrived and started the

plane without performing a preflight inspection. As he was leaving, appellant's son asked if he could accompany Cregier, and Cregier consented. Approximately 10 minutes after take-off, the plane crashed, killing both Cregier and Armando Nava.

Although the evidence was somewhat conflicting, it appears that the crash was caused by the absence of counterweights on the plane's elevators. The defendants at trial were Apodaca, Truly Nolen and the Estate of Skip Cregier. As to Truly Nolen, the case was submitted to the jury on the theory of vicarious liability for the negligence of the pilot and on the theory of negligent failure to discover and warn the pilot of a dangerous condition, i.e., the absence of the counterweights. Although the jury returned a verdict in favor of appellant in the amount of $60,000 against all three defendants, the trial court entered judgment n.o.v. in favor of Truly Nolen.

The issues raised on appeal are (1) whether Truly Nolen, as owner of the airplane, is liable under A.R.S. § 28–1747 for the negligence of the pilot, and (2) whether Truly Nolen is liable for failing to discover and warn the pilot of the absence of the counterweights.

## OWNER'S LIABILITY

A.R.S. § 28–1747 provides:

"Each pilot is responsible for damage to a person or property caused by aircraft directed by him or under his control which results from the negligence of the pilot, either in controlling the aircraft or while giving instructions to another, and if the pilot is the agent or employee of another, both he and his principal or employer shall be responsible for the damage."

Appellant argues that this statute was intended to change the common law[1] to make airplane owners liable for damages caused by the negligence of pilots acting as

---

1. Under the common law a principal is not responsible for physical harm caused by the negligent conduct of an agent who is not a servant, even though the agent is engaged in the principal's business, unless the act causing the harm was done in a manner directed or authorized by the principal. *Consolidated Motors, Inc. v. Ketcham*, 49 Airz. 295, 66 P.2d 246 (1937).

their agents, and further that the existence of an agency relationship was established by the evidence, in particular Nolen's testimony that Cregier had his authority to test fly the plane. While we agree with appellant's interpretation of the statute, we do not agree with her characterization of the relationship between Truly Nolen and Cregier.

■ Appellant does not contend that Cregier was an employee of Truly Nolen. Accordingly, the latter's liability under the statute must be premised upon the existence of an agency relationship. The Restatement defines agency as "... the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." Restatement (Second) of Agency, § 1 (1958); see also, *State v. Superior Court in and for Pima County*, 120 Ariz. 501, 586 P.2d 1313 (App.1978). Reservation by the asserted "principal" of the right to control the transaction is essential to the existence of an agency relationship. *Independent Gin Co., Inc. v. Parker*, 19 Ariz.App. 413, 508 P.2d 78 (1973).

■ Where personal property is delivered to one party by another in trust for a specific purpose, with the express or implied agreement that the property will be returned or accounted for when the purpose is accomplished, the transaction constitutes a bailment. *Kantola v. Lovell Auto Co.*, 157 Ore. 534, 72 P.2d 61 (1937); 8 Am.Jur.2d, Bailments, § 2 (1980). The primary distinction between an agency and a bailment is the bailee's freedom from control by the bailor and the inability of the bailee to subject the bailor to liability in contract or tort. Restatement (Second) of Agency, § 12, comment c (1958). Although a transaction may simultaneously involve a bailment and an agency, unless the party delivering the property retains control over the transaction, no agency is thereby created. See *Lionberger v. United States*, 371 F.2d 831 (Ct.Cl.1967).

Although we have found no Arizona cases on this point, the courts in other jurisdictions have held that the delivery of a chattel to a third party for repairs generally constitutes a bailment. See, e.g., *Richard Kelley Chevrolet, Inc. v. Williams*, 343 So.2d 776 (Ala.Civ.App.1977) (automobile); *Downey v. Martin Aircraft Service*, 96 Cal.App.2d 94, 214 P.2d 581 (1950) (airplane); *Kern v. Harris*, 30 Ore.App. 723, 567 P.2d 1069 (1977) (truck); *Boeing Airplane Co. v. Firemen's Fund Indemnity Co.*, 44 Wash.2d 488, 268 P.2d 654 (1954) (airplane). In the *Boeing* case, the court held that a bailment was created where the owner of an airplane delivered it to operators of a firm engaged in selling, repairing and checking airplanes for the purpose of having the plane serviced. 268 P.2d at 659. The court further held that the bailment contract was not ended until the owner recognized the completion of the work, including the satisfactory test flights, even though those flights were flown by the owner's pilot. 268 P.2d at 660. Although the *Boeing* case involved an express contract which obligated *Boeing* to correct any defects discovered during the test flight, we do not believe that the absence of an express contract in this case warrants a different conclusion either as to the nature of the relationship or its duration.

■ The evidence established that Truly Nolen delivered the plane to Apodaca as an employee of Tucson Commander for the purpose of repairing the tail section at least six months prior to the fatal accident, thereby creating a bailment. The plane apparently remained there until December 1979, when Cregier took possession in order to switch the plane's engines, thereby becoming a bailee in his own right. The plane was again delivered to Apodaca in February 1980, when he opened his own business. Appellant argues that a separate bailment to Cregier occurred by virtue of Nolen's "selection" of Cregier to perform an avionics test flight. Contrary to her contentions, however, the evidence establishes that Nolen's efforts to fly the plane himself on March 14 were aborted and that he therefore never regained possession of the airplane so as to terminate

the earlier bailment. Further, Nolen's undisputed testimony is that he did not talk to Cregier between the two test flights, did not instruct him to perform another test flight, indeed, did not know the precise purpose of the second test flight. Nor is there any evidence to show that Nolen knew that Cregier had not yet flown the second test flight when he began his preflight inspection on March 14.

▮ Viewing the transaction as a whole, the evidence also fails to establish that Truly Nolen retained the right to control the performance of either Apodaca or Cregier, an essential part of an agency relationship. Both Nolen and Apodaca testified that in no way did Nolen exercise or attempt to exercise any control over the repair work that was done on the tail section. Appellant argues that Nolen's testimony that Cregier had his authority to perform whatever test flights were necessary establishes the existence of an agency relationship. Taken in context, however, and in light of federal requirements that a plane which has been subject to substantial repairs or alterations be test flown by an appropriately rated pilot before it may carry passengers (see 14 C.F.R. § 91.-167(a)), we deem Nolen's testimony to mean nothing more than that Cregier was authorized to complete the purpose of the bailment, i.e., the repair of the airplane which necessarily included the requisite test flights. This is true regardless of whether the purpose of the March 14 test flight was related to the engine replacement, the tail section repair, or the avionics. Nolen was not a licensed mechanic and therefore could not perform any of the repairs. The test flights were clearly the final step in the repair process. We therefore hold that the evidence establishes only the existence of a bailment, and that there is no evidence of Truly Nolen's control or right to control Cregier's performance of the test flight which would support a finding of an agency relationship between Cregier and Truly Nolen. Accordingly, liability for Cregier's negligence cannot be imposed on Truly Nolen under A.R.S. § 28–1747.

## LIABILITY FOR FAILURE TO WARN

▮ Appellant argues alternatively that Truly Nolen is independently liable for its failure to discover and warn Cregier of the absence of the counterweights. This argument is predicated upon § 392 of the Restatement (Second) of Torts, which provides:

"One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it."

It is well established in Arizona that a bailor owes a duty to the bailee to use reasonable care to see that the subject of the bailment is in a reasonably safe condition. *Patterson v. Chenowth*, 89 Ariz. 183, 360 P.2d 202 (1961); *Siverson v. Martori*, 119 Ariz. 440, 581 P.2d 285 (App.1978). However, a bailor's duty of inspection in the case of a bailment for repairs is determined not by § 392 of the Restatement, but rather by § 388, which provides:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

See *Lambert v. Pittsburgh Bridge and Iron Works*, 463 Pa. 237, 344 A.2d 810 (1975). Further, a bailor is not liable to the bailee or to a third party for a dangerous condition which arises after delivery of the subject of the bailment to the bailee. *Siverson v. Martori*, supra.

Appellant argues that Nolen, as president of Truly Nolen, had a duty to inspect the airplane on March 14 before he "supplied" it to Cregier, who would fly the plane in furtherance of Truly Nolen's business purposes. She further contends that, if Nolen had used ordinary care in inspecting the plane, the defect would have been discovered. This argument presupposes that Nolen had regained possession of the plane and then supplied it to Cregier, who accepted the bailment for the purpose of conducting the avionics test flight. As discussed above, however, the evidence does not support the conclusion that Nolen's attempt to fly the plane himself amounted to a retaking of its possession so as to terminate the prior bailment. While Nolen's inspection was admittedly brief, the reason for this was his discovery that there was insufficient fuel and his decision not to wait to fill up the tanks. Further, the evidence does not support the conclusion that Nolen then "supplied" the plane to Cregier or that Cregier "accepted" the plane for the purpose of conducting the avionics test flight. In light of our conclusion that a separate bailment to Cregier was not created by the events of March 14, it follows that the defect of the missing counterweights was one which arose after the creation of the original bailment, knowledge of the existence of which cannot be charged to Truly Nolen. See *Siverson v. Martori*, supra.

For the foregoing reasons, we hold the trial court correctly granted judgment notwithstanding the verdict in favor of Truly Nolen, and affirm.

BIRDSALL, C.J., and HOWARD, J., concur.