ALITALIA, a foreign corporation;
Assicurazioni Generali, S.p.A., a
foreign corporation, Plaintiffs,

v.

ARROW TRUCKING COMPANY, an
Oklahoma corporation; Dynair Tech of
Arizona, Inc., an Arizona corporation,
Defendants.

ARROW TRUCKING COMPANY,
an Oklahoma corporation,
Cross–Claimant,

v.

DYNAIR Tech of Arizona, Inc.,
an Arizona corporation,
Cross–Defendant.

No. CIV–95–2007–PHX–ROS.

United States District Court,
D. Arizona.

Sept. 29, 1997.

Gregory P. Gillis, Michael J. Frazelle, Ridenour Swenson Cleere & Evans, Pheonix, AZ, Emilia Gabriele, Pino & Associates, White Plains, NY, for Alitalia, Assicurazioni Generali, S.P.A.

David W. Counce, Law Offices of David W. Counce, Pheonix, AZ, for Dynair Tech of Arizona, Inc.

Jean Mahoney Gardner, Jeffrey Scott Rogoff, Schindel, Farman & Lipsius, New York City, Elizabeth Savoini Fitch, Turley, Swan & Childers PC, Phoenix, AZ, for Arrow Trucking Co.

## BACKGROUND

SILVER, District Judge.

On September 22, 1995, Plaintiffs Alitalia and Assicurazioni Generali, S.p.A. ("Generali"), foreign corporations organized and existing under the laws of Italy, commenced the instant action against Defendants Arrow Trucking Company ("Arrow"), an Oklahoma corporation, and Dynair Tech of Arizona, Inc. ("Dynair"), an Arizona corporation.[1] Plaintiffs' allegations are as follows.

On some unspecified date, Alitalia entered into a 30–day lease agreement with American Airlines in which Alitalia leased a CF6–80C engine (the "engine"). (Compl.¶ 9.) Under the terms of the lease agreement, Alitalia was required to return the leased engine in as good of an operating condition as when it was delivered to Alitalia. *Id.* ¶ 11. Alitalia was also required to pay leasing costs, on a per diem basis, for any extension beyond the agreed upon lease term. *Id.* ¶ 12.

On an unspecified date, the engine was installed on an Alitalia aircraft and flown to the Dynair facility at Sky Harbor International Airport in Phoenix, Arizona. *Id.* ¶ 13. The engine was removed from the Alitalia aircraft on November 5, 1994. *Id.* ¶ 14. Arrangements were made by and between Dynair and Arrow to transport the engine by road to American Airlines's engine facility in Tulsa, Oklahoma. *Id.* ¶ 15. On November 5, 1994, the engine was loaded onto a truck owned, operated, maintained, managed, and controlled by Arrow and/or Dynair and departed the Dynair facility after routing instructions were provided to the truck operator by Dynair. *Id.* ¶ 16. The truck carrying the engine left the Dynair facility and entered the airport road system on the route suggested by Dynair. *Id.* ¶ 17. After traveling approximately 1000 meters, the truck attempted to pass under a road access bridge and the engine collided with the overpass. *Id.* The engine was returned to the Dynair facility during which the damage to the engine was assessed and the engine was rerouted on a proper route out of the airport to Tulsa. *Id.* ¶ 18.

---

1. Dynair's name has changed to SabreTech, Inc. as a result of the sale of the company. The Court will continue to refer to Dynair to avoid confusion.

The engine was insured by an insurance policy issued by Generali to Alitalia. *Id.* ¶ 10. Generali incurred the costs of repair of the engine under the insurance policy. *Id.* ¶ 19. Generali paid $626,373.00 for the repairs. *Id.* Alitalia also paid the $10,000.00 deductible under the insurance policy. *Id.* ¶ 20. Alitalia also incurred additional leasing expenses for the engine during the time that the engine was being repaired.[2] *Id.* ¶ 21. Alitalia incurred $391,000.00 in additional leasing expenses.[3] *Id.*

Plaintiffs alleged causes of action based on negligence, breach of contract, and the Carmack Amendment to the Interstate Commerce Act.[4]

On October 31, 1995, Defendant Arrow filed a cross-claim against Defendant Dynair seeking indemnification or contribution. Defendant Arrow alleged that any injury or damage sustained as alleged in Plaintiffs' Complaint was caused solely by the negligence of Defendant Dynair without any negligence or culpable conduct on the part of Defendant Arrow.

On February 5, 1997, Defendant Arrow moved for partial summary judgment on the issue of consequential damages. On March 13, 1997, Plaintiffs cross-moved for partial summary judgment against Defendant Arrow.

On February 19, 1997, Defendant Dynair moved for summary judgment against Plaintiffs' Complaint and Defendant Arrow's Cross Claim. On March 19, 1997, Defendant Arrow cross-moved for summary judgment against Defendant Dynair.

2. Plaintiffs' response to Arrow's Initial Request for Interrogatories indicates that repairs to the engine were completed on or about February 23, 1995. (Arrow's SOF Ex. E.)

3. Plaintiffs' response to Arrow's Initial Request for Interrogatories indicates that Alitalia incurred additional lease costs of $377,400. (Arrow's SOF Ex. E.) Plaintiffs claim that Alitalia's daily lease rate was $3,400. *Id.*

4. Plaintiffs' breach of contract and negligence claims were dismissed pursuant to the parties' stipulation on February 27, 1996. The parties recognized that Plaintiffs' state law claims were preempted by the Carmack Amendment. *South-*

Oral argument was set on the cross-motions for summary judgment on October 6, 1997 and November 3, 1997.[5]

## DISCUSSION

Summary judgment is appropriate when the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating that no material fact is in dispute. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Courts must view the evidence in the light most favorable to the nonmoving party and draw any reasonable inferences in the nonmoving party's favor. *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996). However, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, ... the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## I. Arrow's Motion for Partial Summary Judgment Regarding Consequential Damages

Arrow seeks partial summary judgment against Plaintiffs' request for consequential

*eastern Express Co. v. Pastime Amusement Co.,* 299 U.S. 28, 29, 57 S.Ct. 73, 74, 81 L.Ed. 20 (1936) (stating that the Carmack Amendment preempts all state causes of action for damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination).

5. Because of the Court's resolution of Dynair's Motion for Summary Judgment, the hearing set for November 3, 1997 is vacated. The hearing set for October 6, 1997 on Plaintiffs' Cross–Motion for Summary Judgment Against Defendant Arrow has not been vacated.

or special damages. Arrow notes that Alitalia is seeking to recover the additional leasing expenses for the engine incurred during the time that the engine was being repaired. (Compl. ¶ 21.) Arrow contends that Plaintiffs are limited to recover the actual damage to the engine in accordance with the Carmack Amendment to the Interstate Commerce Act. Arrow claims that neither Arrow's truck driver, Danny Goynes, nor Arrow's dispatcher, Steven Savage, were informed any time prior to the transportation of the engine that the engine was owned by American Airlines and leased to Alitalia. (Goynes Dep. at 49, 55; Savage Dep. at 17.) Arrow claims that even Robert Perley of McDonnell Douglas Corporation, who engaged Arrow to transport the engine, did not know that the engine was leased by Alitalia. (Perley Dep. at 51.) Arrow notes that Plaintiffs stated in their response to question No. 20 of Arrow's Initial Request for Interrogatories, "The Plaintiffs are unaware of any particular reason why Arrow should have known about Alitalia's lease with American Airlines." (Arrow's SOF Ex. E.)

In response, Plaintiffs contend that a question of fact remains regarding the foreseeability of Alitalia's additional leasing expenses. In support, Plaintiffs assert that: (1) engines similar to the engine involved in the collision are valued as much as $7 million; (2) the value of engines is self-evident; (3) when the damage to the engine first occurred, the damage was estimated at $1.5 to $2 million; (4) the likelihood of extensive damages due to Arrow's negligence in transporting the engine existed from the outset of the accident because of the inherently high value of the engine; (5) it is common practice in the airline industry that engines are leased; (6) it is completely reasonable to assume that the time spent to repair ·the damaged engine would result in increased damages to Alitalia through the extension of the lease; (7) it is reasonable to conclude that Arrow had actual knowledge that Alitalia was leasing the engine from American Airlines; (8) the shipping document prepared by Dynair and provided to Arrow on the day of shipment stated, "Removed from Alitalia MD–11 FUS468, reg No. I–DUPA;" and (9) it is reasonable to infer that Arrow had actu-

al notice that the engine was leased and that additional damages would occur if the engine was damaged, which would require an extension of the lease period. Plaintiffs argue that foreseeability is a factual question for the jury. Plaintiffs also claim that the accurate measure of damages in this case is Alitalia's out-of-pocket expenses resulting from the damage to the engine. (Pls.' Mem. Opp'n Part. Summ. J. at 6–7.)

In reply, Arrow contends that the evidence demonstrates that there was no reason for Arrow to foresee that a delay in delivery would lead to a lease extension costing Alitalia $3,400 per day. (Arrow's Reply Mem. at 3.) Arrow notes that Plaintiffs cannot point to any admissible evidence showing that anyone from Arrow was informed that the engine was leased by Alitalia. *Id.* Arrow reasserts that at no time prior to transportation of the engine was anyone acting on behalf of Arrow informed that the engine was owned by American Airlines and leased to Alitalia. *Id.* Arrow notes that Plaintiffs do not contend that Arrow was informed about the economic consequences of failing to make a timely and satisfactory delivery. *Id.* Arrow asserts that Plaintiffs do not even allege that Robert Perley of McDonnell Douglas, who hired Arrow, knew about the Alitalia–American Airlines lease. *Id.* Arrow reasserts that Plaintiffs admitted in their Response to Arrow's Initial Request for Interrogatories that they were unaware of any particular reason why Arrow should have known about Alitalia's lease with American Airlines. *Id.* Arrow contends that Plaintiffs' reliance upon the fact that jet engines are expensive, it is a common practice to lease engines, and that Dynair's shipping ticket indicates engine was removed from an Alitalia airplane is irrelevant and inadequate in demonstrating that Arrow knew or should have known about the lease and its impending termination. *Id.* at 4. Arrow contends that Plaintiffs cannot demonstrate that Arrow had actual notice that the engine was being leased by Alitalia. *Id.*

■ The version of the Carmack Amendment in effect at the time of the collision in this case provided in relevant part:

A common carrier . . . subject to the jurisdiction of the Interstate Commerce Commission . . . shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier . . . and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the *actual loss* or *injury to the property* caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States.

49 U.S.C. § 11707(a)(1) (emphasis added). "By limiting a carrier's liability to the actual loss or injury *to the transported property,* Congress intended to provide certainty to both shippers and carriers, and to enable carriers to assess their risks and predict their liability for damages." *Counter v. United Van Lines, Inc.,* 935 F.Supp. 505, 507 (D.Vt.1996) (emphasis added); *Pietro Culotta Grapes Ltd. v. Southern Pacific Transp. Co.,* 917 F.Supp. 713, 716 (E.D.Cal.1996). Although the "general rule for determining the amount of damages is the difference between the market value of the property in the condition in which it should have arrived at its destination and its market value in the damaged condition in which it did arrive," *F.J. McCarty Co. v. Southern Pacific Co.,* 428 F.2d 690, 692 (9th Cir.1970), this rule is not absolute, *id.* The general rule is not applied "in cases where it is demonstrated that another rule will better compute actual damages" or where "on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss." *Id.* (internal quotations omitted). "The Carmack Amendment has not altered the common law rule that special, or consequential, damages are not usually recoverable in an action for breach of contract." *Contempo Metal Furniture Co. of Cal. v. East Tex. Motor Freight Lines,* 661 F.2d 761, 765 (9th Cir.1981). "Special damages are those that the carrier did not have reason to foresee as ordinary, natural consequences of a breach when the contract was made." *Id.* "Only those damages can be

recovered as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract." *F.J. McCarty,* 428 F.2d at 693 (citing *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145, 5 Eng. Rul. Cas. 502 (1854)). "To recover special damages, the plaintiff must show that the carrier had *notice* of the special circumstances from which such damages would flow." *Contempo,* 661 F.2d at 765 (emphasis added). The general rule requires that "notice of the special damages . . . be given *at or before the contract is made.*" *Id.* (emphasis added). "The purpose of this rule is to enable the carrier to protect itself from special damages by negotiating special contractual terms, declining the shipment, or taking special precautions to avoid the loss." *Id.* "Because the carrier is taking a risk that events appreciably beyond its control may prevent it from performing the contract, the carrier is entitled to notice of any unforeseeable consequences of nonperformance so that the carrier can protect itself." *Id.* "Notice after the contract is made does not afford opportunity for this self-protection." *Id.*

■ The Court concludes that Arrow is correct that Plaintiffs' request for recovery of additional leasing expenses incurred during the repair of the engine constitutes a request for special damages because such expenses were not reasonably foreseeable to Arrow when it undertook to transport the engine. Plaintiffs have offered no relevant admissible evidence demonstrating that Plaintiffs' additional leasing expenses were reasonably foreseeable at the time of formation of Arrow's carrier agreement. Although Plaintiffs contend that foreseeability is a factual question, the Court concludes that Plaintiffs have not offered evidence creating a genuine issue of material fact regarding the foreseeability of the additional leasing expenses. Regarding the issue of whether Arrow had explicit or implicit notice regarding the leasing arrangement between Alitalia and American Airlines at the time Arrow agreed to transport the engine, there is no evidence that Arrow knew of the adverse consequences of delivering the engine in a defective condition to American Airlines at the time Arrow entered into the carrier agree-

ment.[6] Allowing Plaintiffs to seek special damages without a showing of notice would undermine the certainty and uniformity intended by Congress in the area of carrier liability. Arrow is entitled to partial summary judgment on the issue of consequential damages.

## II. Dynair and Arrow's Cross–Motions for Summary Judgment

Dynair contends that neither Plaintiffs nor Arrow have come forward with any evidence to establish any wrongful conduct attributable to Dynair.[7] (Dynair's Mem. Supp. Summ. J. at 4.)

In response, Arrow contends that Dynair unquestionably breached its duty to provide a safe means of egress out of its facility. (Arrow's Response at 5.) Arrow contends that Dynair breached its duties owed to Arrow by: (1) failing to warn Arrow's driver that the engine being transported might be too high for Arrow's trailer; and (2) failing to inform the driver about an alternative route out of the Dynair facility and Sky Harbor Airport. *Id.* at 4. Arrow contends that it is entitled to summary judgment against Dynair on negligence because the Dynair employees who were concerned that the engine

was too tall failed to warn Arrow's driver that the engine might be too tall on the trailer and failed to inform Arrow's driver about the existence of the back gate route leading out of the Dynair facility. (Arrow's Response at 14 n. 4.) Arrow also contends that Dynair cannot be granted summary judgment because an issue of fact exists regarding whether Dynair improperly loaded Arrow's truck. (Arrow's Response at 14 n. 4.)

Plaintiffs also oppose Dynair's summary judgment motion on the grounds that: (1) Dynair was a bailee of the engine; (2) Dynair had a duty of reasonable care to protect the engine from loss and destruction; (3) whether Dynair breached its duty is a question of fact for the trier of fact to resolve. Plaintiffs contend that a question of fact regarding whether Dynair breached its duty of reasonable care exists because Dynair did not take the following reasonable steps: (1) measuring the height of the load in light of the threat posed by the overpass; (2) warning the Arrow truck driver that the load was above legal height; (3) preventing the Arrow truck driver from using the route to the Airport's main entrance; and (4) advising the Arrow truck driver that an alternate route

6. Plaintiffs' reliance upon Dynair's shipping ticket is unpersuasive. Assuming *arguendo* that the ticket indicated a lease arrangement between Alitalia and American Airlines, the ticket is not evidence that Arrow was notified about the lease at the time of formation of the shipping contract. *See Contempo*, 661 F.2d at 765 (stating that the general rule requires that "notice of the special damages ... be given *at or before the contract is made*") (emphasis added); *F.J. McCarty*, 428 F.2d at 693 ("Only those damages can be recovered as may reasonably be supposed to have been in the contemplation of the parties *at the time they made the contract*.") (emphasis added).

7. Dynair relies upon the following facts. McDonnell Douglas employees removed the engine from the Alitalia aircraft. (Pithoud Dep. at 13; Dynair's Statement of Facts ("SOF") Ex. 1.) Steven Savage, Arrow's dispatcher, testified that Bob Parley of McDonnell Douglas requested the truck to ship the engine and specifically ordered an air-ride flatbed trailer. (Savage Dep. at 13; Dynair's SOF Ex. 8.) Savage testified that McDonnell Douglas wanted to have exclusive use of the truck. (Savage Dep. at 97; Dynair's SOF Ex. 9.) Savage testified that McDonnell Douglas was billed for the charges to the shipment. (Savage Dep. at 98; Dynair's SOF Ex. 10.) Savage

testified that he wrote in a dispatch report that the engine to be picked up at Dynair's facility was no higher than the legal height of 13 feet and 6 inches. (Savage Dep. at 98–99; Dynair's SOF Ex. 11.) Savage testified that all of the information contained in dispatch reports was provided to the drivers of trucks in order to handle the transportation of the load. (Savage Dep. at 99–100; Dynair's SOF Ex. 11.) Danny Goynes, Arrow's truck driver, did not measure the height of the load before he left Dynair's facility. (Goynes Dep. at 11; Dynair's SOF Ex. 5.) Goynes testified that if he felt that a load was too high, he would measure it. (Goynes Dep. at 13; Dynair's SOF Ex. 6.) Goynes testified that when he looked at the engine loaded onto his truck, it did not look high to him. (Goynes Dep. at 14; Dynair's SOF Ex. 7.) Goynes was not told by anyone at Dynair about how to leave Dynair's facility. (Goynes Dep. at 9–10, 29; Dynair's SOF Ex. 4.) Cheryl Morton, Arrow's Director of Claims Management, testified that Arrow's policy provides that it is the ultimate responsibility of the driver to make sure that the truck has enough room to clear an overpass. (Morton Dep. at 52; Dynair's SOF Ex. 12.)

existed that would have avoided overpasses.[8] Plaintiffs also contend that Dynair breached its duty to exercise reasonable care by assuring Arrow's truck driver that the load was of legal height.

## A. Bailment

■ Plaintiffs contend that Dynair was a bailee of the bailed engine that collided with the overpass, and that Dynair breached its duty of care to the engine.

The law in Arizona regarding bailments is as follows:

To constitute a bailment there must be a delivery by the bailor and acceptance by the bailee of the subject matter of the bailment. It must be placed in the bailee's possession, actual or constructive.

*Webb v. Aero Int'l, Inc.*, 130 Ariz. 51, 633 P.2d 1044, 1045 (Ct.App.1981) (quotation omitted). The Colorado Supreme Court has explicitly recognized that a constructive bailment relationship may exist between parties:

No agreement is necessary; a bailment may be created by operation of law. Thus, where a person comes into lawful possession of the personal property of another, even though there is no formal agreement between the property's owner and its possessor, the possessor will become a constructive bailee when justice so requires.

*Christensen v. Hoover*, 643 P.2d 525, 529 (Colo.1982). Arizona recognizes that a bailor can sue a bailee for damages to bailed property under a theory of negligence. *See, e.g., Buchanan v. Green*, 73 Ariz. 159, 238 P.2d 1107, 1108 (1951). The bailee's duty of care is described by the Colorado Supreme Court as follows:

A bailee's obligation runs to the property bailed, and not solely to the bailor. Once a bailment relationship has been established, the law imposes upon the bailee certain duties and obligations with respect to the bailed property in his possession. However, not all bailees are subject to the same liability for damage to the bailed property; the degree of care to which a particular bailee is held depends upon the nature and characterization of the bailment relationship.

. . .

The very nature of a bailment relationship implies a confidence and trust involving the exercise of some degree of care to protect the subject of the bailment from loss, damage, or destruction. In our view, even a gratuitous bailee must exercise reasonable care to protect the bailor's property, i.e., that which a person of common prudence would use under the circumstances.

*Christensen*, 643 P.2d at 529; *Barrett v. United Airlines, Inc.*, 697 P.2d 408, 409 (Colo.Ct.App.1984) ("The duty owned by the bailee is one of reasonable care to protect the bailed property. . . .").[9]

■ As an initial matter, the Court notes that there is a sufficient basis to proffer evidence to the trier of fact that Dynair was a bailee of the engine damaged in the collision. The record indicates that Arrow's truck driver signed a *Dynair* shipping ticket in order to leave the Dynair facility with the engine. (Pls.' SOF Ex. G.) The damaged engine appears to have been placed in Dynair's actual possession during the time period in which Dynair was responsible for loading the engine onto Arrow's flatbed truck. Therefore, Dynair appears to have owed a duty of care to protect the engine from loss,

8. Bobby Johnson, an employee of Dynair, testified that the back gate route was used for oversized loads. (Johnson Dep. at 51.) Johnson testified that trucking companies that are bringing oversized loads into the Dynair facility "know to come through [the back] gate." *Id.* at 29. In discussing whether a co-worker was aware of the ability to use the backgate route for transporting oversized loads, Johnson testified, "Everybody is aware of that gate." *Id.* at 30.

9. Plaintiffs' reliance upon *Nava v. Truly Nolen Exterminating of Houston, Inc.*, 140 Ariz. 497,

683 P.2d 296 (Ct.App.1984), in support of the proposition that "[i]t is well-settled in Arizona that a bailee owes a duty to use reasonable care to see that the subject of the bailment is kept in a reasonably safe condition" is misleading. *Nava* did not discuss a *bailee's* duty of care, but rather a *bailor's* duty "to use reasonable care to see that the subject of the bailment is in a reasonably safe condition" before relinquishing to the bailee. *Id.* 683 P.2d at 300. Plaintiffs have failed to proffer any Arizona case authority discussing the scope of the bailee's duty of care.

damage, or destruction while it functioned as a bailee.

Plaintiffs and Arrow have proffered evidence indicating that Dynair *may* have breached its duty of care by: (1) improperly loading the engine onto Arrow's truck beyond the legal height limit of 13 feet and 6 inches; (2) failing to warn Arrow's truck driver that the load was too high; or (3) failing to inform Arrow's truck driver that an alternate route out of the Airport for over-sized loads was available through a back gate.

It is undisputed that Dynair employees had concerns about the height of the load prior to the Arrow truck driver's first attempt to depart from the Dynair facility, but failed to communicate these concerns to Arrow's truck driver. Dynair employees also failed to inform Arrow's truck driver regarding the back gate route. Bradford Adams, a Dynair employee, testified at his deposition as follows:

Q. Prior to Mr. Goynes departing for the first time, did your common sense give you any reason to believe that Mr. Goynes ought to exit the DynAir facility through the back gate?

A. It didn't come to mind that I can think of.

Q. You don't remember looking at the engine and saying he ought to go out the back gate?

A. After I talked to Mr. Goynes, yes. No. Not necessarily out the back gate. *There was a question on the height after my discussion with Mr. Goynes.*

Q. *Tell me why you had concerns about the height after your discussion with Mr. Goynes.*

A. When I came out with the ship ticket and had him sign the document, there was two or three employees, I don't recall, I believe they were DynAir Tech employees that were loading, that were done loading it. They were standing up. *They were discussing the height or the size.*

Q. Was Mr. Goynes present or—

A. I don't recall.

Q. Okay. *So you hear these gentlemen discussing the height?*

A. *Correct.*

Q. *That made you wonder if the height, if there was a problem with the height of the load?*

A. *That's correct.*

Q. That was after Mr. Goynes had signed the shipping ticket?

A. That is correct.

Q. But prior to him leaving the DynAir facility?

A. That's correct.

Q. Did *you turn around or try to make any further contact with Mr. Goynes to advise him that your common sense caused you concern about the height of the load?*

A. No. *Myself, no.*

Q. *Did you direct anybody else to flag Mr. Goynes and discuss the concern you had about the height of the load?*

A. *I wasn't in the capacity.*

Q. So you weren't in a supervisory capacity to instruct anyone?

A. Correct.

Q. Based upon your concern, did you take any steps to measure the height of the load?

A. No.

(Adams Dep. at 44–46) (emphasis added). Adams further testified as follows:

Q. What was your memory as to what was going on with the engine at the time that you obtained Mr. Goynes' signature on the shipping ticket?

A. I believe he was chaining down the engine or strapping it to the trailer.

Q. *As you were leaving you heard a couple of DynAir employees wondering about the height?*

A. *I believe it was DynAir employees.*

Q. You just heard some people standing around?

A. There *was [sic] three or four people discussing it.* Uh-huh.

Q. You didn't stop and converse with them?

A. Momentarily.

Q. *About the height?*

A. Yes.

Q. What did those conversations entail?

A. Just generally the height. Is it too tall.

Q. And was there any consensus reached among this group of individuals?

A. From what I saw, everybody was looking at the McDonnell Douglas rep on-site.

Q. Who was that person?

A. I don't recall.

Q. How do you know it was a McDonnell Douglas rep onsite?

A. That is who we were all looking at. *Everybody was looking at him to make the call; was this too high, is it legal, it is going to ship this method.*

Q. You don't recall who that individual was?

A. No. I do not.

Q. How do you know he was a McDonnell Douglas employee, not a DynAir employee?

A. He was McDonnell Douglas. I don't know. I would say I previously met him.

Q. Can you describe him?

A. No.

Q. Did he have on a McDonnell Douglas uniform?

A. No.

Q. Did he have on regular street clothes?

A. I don't recall.

Q. What do you recall him finally saying?

A. It is going. I didn't stick around for too long. I had other responsibilities.

Q. Right.

A. My main responsibility in this was to make sure it was documented. I heard part of a discussion. *They were all looking at the rep, discussing with the rep. They were looking at it. It was the rep's decision, the McDonnell Douglas rep, to go in and let it release, to go ahead and ship it.*

Q. After the rep said ship it, that was it. You left the area where the truck was sitting?

A. I don't recall if I heard him say "ship it, it is going to go," but *it was definitely his decision from what I understood.* It

wasn't DynAir's call saying it is too high, hold the shipment or—they were discussing at the time looking at the McDonnell Douglas rep.

(Adams Dep. at 58–60) (emphasis added). Finally, Adams testified as follows:

Q. Okay. Let's talk now a little more specifically about what exactly was said in that conversation with the three DynAir employees and the McDonnell Douglas employee. *You walk up and they're talking about the height?*

A. *Correct.*

Q. Do you recall what any of the DynAir employees said?

A. No. *I just know they were discussing the possibility of it being too high.*

Q. *They had some concerns about it being too high?*

A. *Correct.*

Q. That led you to have some concerns about it being too high?

A. No. I made a mental note of it. I didn't pay much attention.

Q. I thought that you had said earlier that you did have some concerns about the height of the load.

A. I looked at it. There wasn't much time. I did look. I did pay attention. *I said, that might be too high.* I went back to work.

Q. When it went through your mind that the load might be too high, what in particular was your concern about it being too high, that it might run into something, that it might tip over?

A. *If it isn't within the legal limit the driver will get a ticket.*

Q. In this conversation with the DynAir employees and the McDonnell Douglas employee, was there discussion about the height being too high, that it might exceed the legal limits?

A. Was it for that purpose, I don't know.

Q. Do you remember specifically what any of the DynAir employees said?

A. No.

Q. Do you remember specifically what the McDonnell Douglas employees said?

A. I know he was—they were discussing with him, they were all looking at him. I believe he was saying he was thinking about it, I believe. I don't recall the whole thing. It was definitely his call from the impression that I got. The DynAir employees were looking to him for "Yes. It is going to go" or "No. It is not." That is the impression that I got.

Q. *Did you ever see any DynAir employees say anything to the driver of concerns about the height?*

A. *Not that I am aware of.*

Q. *Did you ever see the McDonnell Douglas employees say anything to the driver about the height?*

A. No.

(Adams Dep. at 78–80) (emphasis added). The failure of Dynair's employees to warn Arrow's truck driver about their concerns regarding the height of the engine load or to otherwise protect the engine from harm creates a genuine issue of material fact that it may have resulted in an unreasonable risk of harm to the engine. The trier of fact may find that Dynair's employees reasonably should have anticipated an unreasonable risk of harm or injury to the engine as a result of the loading of the engine onto Arrow's truck by Dynair's employees. The mere fact that the harm to the engine occurred beyond the boundaries of the Dynair facility is not controlling on whether the risk of harm was unforeseeable. *See Udy v. Calvary Corp.,* 162 Ariz. 7, 780 P.2d 1055, 1059 (Ct.App. 1989) ("Harm that is caused, in whole or in part, by an activity or condition on particular premises cannot be viewed as unforeseeable as a matter of law merely because it happens to manifest itself beyond the property line."). Dynair is not entitled to summary judgment.

**B. Duty to Provide Safe Means of Egress**

Plaintiffs and Arrow contend that Dynair, as a landowner, owed a duty to provide a safe means of egress out of its facility to its. business invitees and that Dynair breached its obligation.

■■■■■ "A business visitor or invitee is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Stephens v. Bashas' Inc.,* 186 Ariz. 427, 924 P.2d 117, 120 (Ct.App. 1996). "A person making a delivery to a business is a business invitee." *Id.* In Arizona, a business owner has an affirmative duty to maintain its premises in a reasonably safe condition for invitees. *Tribe v. Shell Oil Co.,* 133 Ariz. 517, 652 P.2d 1040, 1042 (1982). "An invitation to enter premises carries with it the duty to invitees to provide reasonably safe means of ingress and egress." *O'Rielly Motor Co. v. Rich,* 3 Ariz.App. 21, 411 P.2d 194, 199 (1966). Although the general rule in Arizona is that "a proprietor is not liable to an invitee for *injuries* from dangerous conditions which are obvious or as well known to the invitee as to the proprietor, ... if the proprietor should *anticipate* the harm from the condition despite its obviousness, he may be liable for *physical injury* caused by that condition." *Tribe,* 652 P.2d at 1042 (emphasis added). In *Stephens,* the Arizona Court of Appeals stated: "When the activities conducted on the business premises affect the risk of injury off-premises, the landowner may have an obligation to correct the condition or guard against foreseeable injuries.'" *Id.* 924 P.2d at 121 (quoting *Ember v. B.F.D., Inc.,* 490 N.E.2d 764, 772 (Ind.Ct.App.1986)). In formulating the duty owed to business invitees, Arizona relies upon the Restatement (Second) of Torts. *Martinez v. Asarco Inc.,* 918 F.2d 1467, 1471 (9th Cir.1990). Section 343 provides:

A possessor of land is subject to liability for *physical harm caused to his invitees* by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965) Section 343A provides in relevant part:

(1) A possessor of land is not liable to his invitees for *physical harm caused to them*

by an activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

Restatement (Second) of Torts § 343A(1) (1965) (emphasis added).

■ Although it appears that Dynair had a duty to provide a safe exit to Arrow's truck driver, Danny Goynes, neither Plaintiffs nor Arrow are seeking to recover damages for injuries that Goynes sustained, if any, as a result of the collision with the overpass at Sky Harbor International Airport. Instead, Plaintiffs and Arrow are seeking to assert liability against Dynair for harm sustained to the engine leased by Alitalia from American Airlines. Neither Plaintiffs nor Arrow have steered the Court to any case authority in which a carrier or other business invitee has recovered for harm sustained to cargo pursuant to the breach of the duty owed to business invitees. Accordingly, the Court finds that the duty to make premises reasonably safe for use by invitees is inapplicable.

## C. Duty to Properly Load Engine

### 1. Improper Loading

Plaintiffs and Arrow contend that Dynair's loading of the engine on the Arrow flatbed truck was improper because it violated Arizona's vehicle height limit of 13 feet and 6 inches. *See* A.R.S. § 28–1004 ("A vehicle unladen or with a load shall. not exceed a height of thirteen feet six inches above the level surface upon which such vehicle stands without a permit issued under the provisions of § 28–1011 or this section.").

■ Under the common law, responsibility for *obviously* improper loading generally rests on the carrier, and it must indemnify the shipper even though the shipper loaded the truck. *Franklin Stainless Corp. v. Marlo Transp. Corp.*, 748 F.2d 865, 868 (4th Cir.1984) (emphasis added). There is an exception, however, for acts of the shipper.[10] The allocation of responsibility between the shipper and the carrier for improper loading

is discussed in *United States v. Savage Truck Line Inc.*, 209 F.2d 442 (4th Cir.1953), *cert. denied*, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954), as follows:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are *latent* and *concealed* and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*Id.* at 445 (emphasis added); *Symington v. Great Western Trucking Co.*, 668 F.Supp. 1278, 1282 (S.D.Iowa 1987) ("While responsibility for obviously improper loading rests on the carrier, the shipper is liable for loading defects which are latent and concealed."). Although the total height of a vehicle load may be an "observable" defect in that it may be apparent to the naked eye, it is not necessarily a patent defect in that the excess height may not be readily apparent. *Ebasco Servs., Inc. v. Pacific Intermountain Express Co.*, 398 F.Supp. 565, 568 (S.D.N.Y. 1975). What is patent may depend in part upon the experience of the observer. *Id.* "[A]n experienced flat-bed truck driver might notice a height surplus, but, on the other hand, a surplus of possibly one foot over the 13 1/2 foot limit (approximately 7%) might well be beyond a less-experienced driver's ability to recognize." *Id.* (holding that question of whether excessive height of load was patent is not one for resolution by summary judgment in action to recover for damages sustained to pump motor that struck the underside of a New York State vehicular bridge while being transported on a flat-bed trailer truck). A defect in loading may not be open and obvious to a trucker who is *given assurances* by the shipper's employees that there was no defect in the loading of the cargo. *See Franklin*, 748 F.2d at 868–69 (stating that evidence showed that defect in manner of loading was not open and obvious

10. Although Dynair may claim that it is not a "shipper," the Court finds that the case authority discussing the allocation of responsibility be-tween shippers and carriers for loading defects is sufficiently analogous to warrant application in this case.

because shipper's employee assured carrier's truck driver that shipper used standard loading method and that there would be no trouble with the load); *Ebasco*, 398 F.Supp. at 569 (stating that shipper's employees' representation that the excessive height load was of proper height raised genuine issue of material fact bearing on ultimate allocation of liability between shipper and carrier).

■ It is undisputed that only Dynair employees actually loaded the engine onto the Arrow truck. Troy Pithoud, Dynair's program manager, testified that Dynair employees assisted in the loading of the engine onto the Arrow truck. (Pithoud Dep. at 26; Dynair's SOF Ex. 3.) Pithoud testified that a Dynair employee operated the forklift that was used to actually load the engine onto the Arrow truck. *Id.* Arrow's truck driver simply tied down the load. (Goynes Dep. at 9.) Dynair has conceded in its Memorandum of Points and Authorities in Support of its Motion for Summary Judgment that Arrow's truck driver "attempted to drive under an overpass that was a few inches lower than the highest point of the engine." (Dynair's Mem. Supp. Summ. J. at 3.) Although Dynair contends that it can be inferred that the engine load was of legal height, (Dynair's SOF Supp. Reply to Pls.' SOF ¶ 7), Dynair's inference necessarily assumes that the overpass involved in the collision was less than 13 feet 6 inches. Dynair has not offered any evidence that the overpass involved in the collision with the engine was less than 13 feet 6 inches in height. Because the engine collided with an overpass at Sky Harbor International Airport, a reasonable fact finder might infer that the height of the load carrying the engine was above the legal limit in the State of Arizona.[11]

As mentioned above, Dynair has conceded that the overpass involved in the collision "was a *few inches* lower than the highest point of the engine." (Dynair's Mem. Supp.

Summ. J. at 3) (emphasis added). A trier of fact might conclude that regardless of Arrow's truck driver's experience,[12] his failure to recognize the excessive height, which amounted to "a few inches," may not indicate a patent defect. Further, Plaintiffs and Arrow have proffered evidence indicating that the excessive height defect may have been concealed by the assurances of Dynair's employees that the engine load was of legal height. To illustrate, Danny Goynes testified as follows:

Q. Did you measure the height of the load before you left?

A. Before I left DynAir?

Q. Yeah, before you left the first time.

A. No.

Q. Did you have an understanding or an estimate about what the height was?

A. I *understood that it was a legal height. That's what they told me.*

Q. And by legal height, you mean Cheryl Morton mentioned that anything over thirteen six, I think, is—

A. Thirteen six, yeah.

Q. If it's over thirteen six, it's a high load, or whatever. It was under that?

A. Yeah.

Q. Who told you that, your dispatcher?

A. No, dispatch didn't tell me. Dispatch didn't tell me that. *The people that loaded it said it was legal height.*

Q. What precisely did—well, *did you ask somebody there how high the load was?*

A. *Yeah, I asked the people that were loading it how high it was. They said it was legal height, that's all I got.*

Q. These are people that were at the facility there, but you don't know who they worked for?

A. *They were loading the engine. So I figured they were DynAir people.*

---

11. The Court recognizes that the director of the Arizona Department of Transportation can issue special permits in order to exceed the state-imposed height limitation. *See* A.R.S. § 28–1011; *Finn v. J.H. Rose Truck Lines,* 1 Ariz.App. 27, 398 P.2d 935, 939 (1965). Nothing in the record indicates that a special permit was issued to operate the Arrow flatbed truck involved in the collision at issue in this case.

12. Danny Goynes testified that at the time of his deposition in July 1996, he had had four and a half years of experience driving flatbed trucks. (Goynes Dep. at 14; Dynair's SOF Ex. 7.) The accident occurred on or about November 5, 1994.

Q. Did you talk to one particular person?

A. No. It was three or four there loading it.

Q. Well, and all four of them were talking about height?

A. Well, I talked to one person, one of the guys. But I couldn't tell you his name. I never got names or anything.

Q. Can you describe what the guy looked like that talked about the height?

A. No, I can't.

Q. *So. your understanding, when you left that day, was that this load was either thirteen six or shorter?*

A. Yes.

(Goynes Dep. at 11–13; Arrow's SOF Ex. D) ( emphasis added). It is undisputed that the individuals who loaded the engine onto Arrow's truck were employed by Dynair. (Goynes Dep. at 12; Pithoud Dep. at 26; Adams Dep. at 45.) To the extent that Dynair claims that a McDonnell Douglas employee was the individual who told Arrow's truck driver that the load was a "legal height," (Dynair's SOF Supp. Reply to Pls.' SOF ¶ 3), that is an issue to be resolved by the fact finder. Based on the circumstances and evidence in this case, the Court concludes that a trier of fact could find that Dynair is liable for loading defects which are latent and concealed. Summary judgment in favor of Dynair is inappropriate.

### 2. Negligent Misrepresentation

■ Dynair may also be liable for negligently misrepresenting to Arrow's truck driver that the height of the engine load was within the legal height limit. (Goynes Dep. at 11–13; Arrow's SOF Ex. D.) If Goynes's testimony is accurate, then Dynair employees may have incorrectly represented to Goynes that the engine load was within the legal height limit. At minimum, Plaintiffs and Arrow have created a genuine issue of material fact regarding whether Dynair negligently misrepresented the height of the engine load to Arrow's truck driver.

### D. Arrow's Cross–Motion for Summary Judgment

■ Although Plaintiffs and Arrow have certainly established a genuine issue of material fact regarding whether Dynair's acts and omissions in relation to the damaged engine constitute negligence, the Court finds that summary judgment in favor of Cross–Claimant Arrow regarding Dynair's indemnification or contribution liability is also inappropriate. The issues of breach of the standard of care and causation are ordinarily resolved by the trier of fact. *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 706 P.2d 364, 369–70 (1985) ("the general rule to be applied is that where reasonable people could differ as to whether the danger of some injury is foreseeable, the question of negligence is one of fact for a jury to decide") ("The question of proximate cause is usually for the jury. . . ."). The Court finds that based on the evidence presented whether Dynair acted negligently in carrying out its duties as a bailee and a loader of the engine onto the Arrow truck and whether Dynair's alleged breaches proximately caused the harm to the engine are questions of fact for the jury's determination.[13]

Accordingly,

**IT IS ORDERED** that Defendant Arrow Trucking Company's Motion for Partial Summary Judgment (Doc. # 27) is granted. Plaintiffs' claim for consequential damages is dismissed.

**IT IS FURTHER ORDERED** that Defendant and Cross–Defendant Dynair Tech of Arizona, Inc.'s Motion for Summary Judgment (Doc. # 30) is denied.

**IT IS FURTHER ORDERED** that Cross–Claimant Arrow Trucking Company's Cross–Motion for Summary Judgment (Doc. # 42–1) is denied.

---

**13.** In particular, the Court notes that whether Dynair satisfied its duty of care by notifying McDonnell Douglas's "supervising" employee regarding Dynair's height concerns and whether Dynair was "capable of doing more than it did," (Dynair's Reply Mem. at 3), are issues for the trier of fact. The Court is not persuaded that it must find as a matter of law that Dynair's warning to the McDonnell Douglas employee breached Dynair's duty of care. (Arrow's Reply Mem. Supp. Cross–Mot. Summ. J. at 7.)

**IT IS FURTHER ORDERED** that the hearing set for November 3, 1997 is vacated.