OPINION
{¶ 1} Plaintiff-appellant, Willard Eugene Brashear ("appellant"), individually and as executor of the Estate of Todd Alan Brashear, appeals the judgment of the Franklin County Court of Common Pleas, in which that court granted a directed verdict in favor of defendant-appellee, Liebert Corporation ("appellee").
 {¶ 2} This case arises out of the tragic and untimely death of 31-year-old Todd Brashear ("the decedent"), who died as a result of injuries he sustained on November 23, 2001, when the tractor-trailer he was driving rolled over while he was negotiating a ramp from Interstate 70 eastbound to Interstate 71 southbound in Columbus, Ohio.
 {¶ 3} In November 2001, the decedent was employed as a commercial truck driver with PDQ Transport, Inc. ("PDQ"), located in Grove City, Ohio. He had worked at PDQ since September 2000, and had worked as a commercial truck driver for ten years prior to his employment with PDQ. As part of his duties with PDQ, the decedent transported loads of cargo from appellee's Delaware, Ohio facility to PDQ's facility in Grove City, approximately two to three times per week. Other drivers later hauled this cargo to destinations inside and outside of Ohio. Appellee's cargo usually consisted of large, heavy battery cabinets being shipped to commercial customers for installation as secondary or uninterruptible power sources.
 {¶ 4} On November 23, 2001, the day after Thanksgiving, the decedent arrived at appellee's Delaware facility to pick up a trailer that appellee's employees had, two days earlier, loaded with a shipment of batteries. Appellee's facility was closed for the holiday weekend but a security guard was on site. The decedent coupled his tractor to the loaded trailer and proceeded toward PDQ's Grove City location. It is unknown whether the decedent inspected the load prior to leaving appellee's facility. His route eventually took him eastbound on Interstate 70.
 {¶ 5} Three Columbus Police Department recruits, who were traveling on Interstate 70 toward the south end of Columbus, noticed the decedent's truck approximately four to five miles west of Interstate 71. While traveling directly behind the decedent's truck, they noticed that the trailer was severely leaning to the left. The recruit who was driving did not want to pass the decedent's truck because of the truck's severe lean, which one of the recruits recalled was approximately 10 to 15 degrees in severity. Both the recruits and the decedent were traveling in the right lane at approximately 55 miles per hour and slowed to 45 miles per hour upon their approach to the ramp from Interstate 70 eastbound to Interstate 71 southbound.
 {¶ 6} As the truck attempted to negotiate the curved ramp, the truck's right rear tire lifted off of the road and then returned to the road three to four times. When this tire lifted off for the last time the truck flipped over to the left. The trailer whipped around and over the guardrail, slid down the embankment, and came to rest in a position perpendicular to the roadway. The rig was positioned on its left side, pinning the decedent in his cab. It took firefighters 45 minutes to extricate the decedent from the cab. Emergency medical personnel rushed him to Grant Hospital, where he died shortly after arrival, having sustained massive crushing injuries to his chest.
 {¶ 7} Later, appellant instituted this negligence action against appellee, PDQ, and the owner of the rig, Dukes Truck Trailer Service. Appellant's claims against PDQ and Dukes Truck Trailer Service were subsequently dismissed, while appellant's claim against appellee went forward to trial, having survived a motion for summary judgment. Appellant's theory was that appellee's employees had negligently loaded the trailer, and this negligence was the proximate cause of a load shift, which, in turn, caused the rollover that resulted in the decedent's death.
 {¶ 8} At the close of appellant's case, appellee moved for a directed verdict. It argued that a commercial truck driver is responsible for ensuring that his cargo is properly and securely loaded, the decedent had the opportunity to inspect the load, and appellant had presented no evidence that any loading defect was latent or concealed such that the decedent would have been unable to discover it upon a reasonable inspection. The trial court agreed and granted the directed verdict in favor of appellee.
 {¶ 9} Appellant timely appeals and advances a single assignment of error for our review:
 The Trial Court committed prejudicial error by directing a verdict in favor of Defendant/Appellee as the evidence presented at trial, when construed most strongly in favor of Plaintiff/Appellant, permitted reasonable minds to conclude that the Defendant/Appellee was negligent in failing to secure the load and that this failure was not apparent to the decedent, Todd Brashear.
 {¶ 10} The Supreme Court of Ohio has set forth the standard appropriately applied to review of a directed verdict:
 According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The "reasonable minds" test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party.
 A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence. Since we are presented with a question of law, we apply a de novo standard of review.
Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St.3d 512,2002-Ohio-2842, 769 N.E.2d 835,-4. (Citations omitted.)
 {¶ 11} The parties present no dispute about which legal principles apply in this case. To establish actionable negligence, a plaintiff must show the existence of a duty, breach of that duty, and damages proximately resulting therefrom. Simmers v. Bentley Constr Co. (1992),64 Ohio St.3d 642, 646, 597 N.E.2d 504. In this appeal, we are concerned with the element of duty because the trial court granted appellee's motion for directed verdict on the basis that the decedent's duty to inspect and to ensure that the load was properly secured was superior to the duty of ordinary care that appellee owed the decedent. "Duty refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." Shivers v. Univ. of Cincinnati, 10th Dist. No. 06AP-209, 2006-Ohio-5518, ?6, citing Commerce Indus. Ins. Co. v.Toledo (1989), 45 Ohio St.3d 96, 98, 543 N.E.2d 1188.
 {¶ 12} Under the law of negligence, a defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. Huston v.Konieczny (1990), 52 Ohio St.3d 214, 217, 556 N.E.2d 505. "Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. (Prosser, PalsgrafRevisited (1953), 52 Mich. L. Rev. 1, 15.)" Mussivand v. David (1989),45 Ohio St.3d 314, 318, 544 N.E.2d 265, quoting Weirum v. RKO General,Inc. (1975), 15 Cal. 3d 40, 46, 123 Cal. Rptr. 468, 539 P.2d 36.
 {¶ 13} The federal courts have held that if a shipper assumes the responsibility for loading its property onto a motor vehicle it has the duty to exercise reasonable care in properly securing the load.Pierce v. Cub Cadet Corp. (C.A.6, 1989), 875 F.2d 866. However, under federal decisional law and the regulations governing commercial motor vehicle carriers, "the duty rests upon the carrier to assure that the packing of goods received by it for transportation is such as to secure their safety." Fernandez v. Anheuser-Busch, Inc., 10th Dist. No. 01AP-1279, 2002-Ohio-3355, ?23, citing United States v. Savage TruckLines, Inc. (C.A.4, 1953), 209 F.2d 442, 445.
 {¶ 14} In Fernandez, this court adopted the reasoning of the federal courts on this issue, holding that a truck driver's negligence claim, based on injuries he sustained after his load shifted and his truck rolled, was properly dismissed on summary judgment where the evidence revealed that he observed the loading of beer kegs into his truck, he visually inspected the loaded pallets and he was experienced in driving loads of palletized kegs of beer. We adopted the rule that the shipper is liable for defects that are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; if the improper loading is apparent, however, the carrier will be liable notwithstanding that the shipper was negligent. Pierce, supra;Savage Truck Lines, supra, at 445; see, also, DeLong v. Roeder CartageCo., Inc., 3rd Dist. No. 1-03-44, 2004-Ohio-1722.
 {¶ 15} In the present case, the issue raised by appellant's assignment of error is whether, when the evidence is viewed in the light most favorable to appellant, reasonable minds could conclude that the alleged defect (assuming arguendo that a defect was present) was latent and concealed and would not have been observable by the decedent upon an ordinary inspection. To resolve this issue, we have carefully examined the evidence adduced at trial.
 {¶ 16} Officer Ron Moder, of the Columbus Division of Police, was the lead accident investigator for the decedent's accident. He has been a Columbus police officer since 1995 and has worked in the accident investigation unit since September 2001. He completed a report and took photographs of the scene of the decedent's crash. He testified that, under applicable laws and regulations, truck drivers are responsible for securing their loads. He further testified that the decedent's load was not sealed, meaning that it would have been accessible for inspection by the decedent prior to the accident.
 {¶ 17} Donald Smith ("Smith"), works in appellee's shipping department, and loaded the trailer that the decedent was hauling when the accident occurred. He testified that the weight of the cargo was listed on the bills of lading, which were admitted as Plaintiff's Exhibit 15. The total weight of the 12 pallets of cargo listed on the bills of lading was 39,370 pounds.
 {¶ 18} Smith testified that the battery units were loaded down the center of the trailer, and were placed on pallets that are bolted to skids. He said that some of the units were also fastened to the pallets with metal banding. He said that this was the typical manner in which appellee's shipping department would load such battery units. He testified that nothing about the way that the cargo was loaded would have prevented the decedent from inspecting it. The decedent could have walked the entire length of the trailer on both sides of the battery units to inspect how they were secured. He stated that appellee never seals its loads.
 {¶ 19} Appellant's theory of the case was that the cargo should have been blocked on all sides with wooden two-by-fours nailed to the truck bed, which are referred to in the vernacular as "nailers." When appellant's counsel inquired about this method, Smith testified that nailers were used infrequently, and that they were used in two instances: when the load was being hauled cross-country, and when the driver requested it. Smith stated that drivers always had the right to ask for a load to be adjusted or secured with nailers, or to refuse to haul a load that they determined to be unsafe.
 {¶ 20} He said that the decedent had been present on the loading dock during loading of cargo he was hauling, though he was not present when Smith and his coworker loaded the specific cargo involved in the accident. He recalled that the decedent had never asked him to adjust a load, though other drivers would occasionally do so. If a driver made such a request, according to Smith, appellee's employees would "absolutely" comply with the request.
 {¶ 21} Smith said that though appellee's facility was closed on the day of the accident, there would have been a security guard present when the decedent picked up the trailer. Smith had never heard of a load shifting, nor had he heard of any complaints or reports of rollovers of loads being hauled from the Delaware facility, other than the decedent's accident.
 {¶ 22} Michael Robson ("Robson"), now retired from appellee, assisted Smith in loading the cargo involved in the accident. He has over 30 years of experience in cargo loading with various employers. He testified that the cargo was loaded and secured in typical fashion and, as was customary, was not sealed. He recalled being asked once by a driver to reload cargo due to unsafe weight distribution, but the decedent was not the driver who made that request. He stated that the decedent picked up loads from appellee's Delaware facility almost daily and had never given Robson instructions regarding how to load cargo. Robson testified that the battery cabinets involved in the accident would not slide easily; as an example, if Robson tried to slide them in the trailer using a forklift, the forklift's tires would smoke. He, too, testified that nothing would have prevented the decedent from inspecting the load on the day of the accident.
 {¶ 23} Michael Dalton ("Dalton"), with the Emergency Remedial Response Unit of the Ohio Environmental Protection Agency ("OEPA"), also investigated the accident. He had been employed with the OEPA for 28 years at the time of trial. He testified that, in his experience, using nailers is a "very common" practice, and that he thought he saw such apparatus inside the decedent's trailer following the accident. He acknowledged, however, that he did not mention nailers in his report, and that photos taken at the scene only show pallets.
 {¶ 24} Officer Dredrick Lane has been a Columbus Police Officer since 1986. He worked as a motor carrier enforcement officer from 1995 to 2002. His duties in that capacity included writing tickets for violations of federal motor carrier regulations and the Ohio Revised Code. He holds a commercial driver's license and has 20 years of experience as a commercial truck driver, including experience with load shifts. He responded to the scene of the decedent's accident. He testified that the weight of the decedent's cargo was within legal limits. He testified that the decedent's load was not sealed and, therefore, the decedent would have had the opportunity to inspect it. He stated that it is the driver's responsibility to ensure that his load is secure.
 {¶ 25} Officer Lane conducted a basic, walk-around inspection of the rig. During that inspection he saw part of the load and saw no visible load-securing apparatus. His inspection revealed no obvious problem with the rig's suspension, or any other mechanical problem, but he could not rule out a mechanical problem as the cause of the severe lean or of the accident itself. He stated that other than a suspension or other mechanical problem, the only thing that would cause a lean and rollover such as the decedent's would be a load shift. However, based on Officer Lane's experience, given the size and weight of the battery units involved, he would not expect that they would shift when loaded down the center of the trailer, even without blocking or bracing apparatus, but said it is possible.
 {¶ 26} When asked whether, in his opinion, a load shift caused or contributed to the decedent's accident, Officer Lane said he could not say. He said that a load shift could have contributed to the rollover only if the majority of the cargo's weight were at the top of the trailer. On cross-examination, he acknowledged that he does not know what caused the rollover.
 {¶ 27} On direct examination, Officer Lane agreed that it would be possible for someone viewing wood pallets to mistake them for nailers, but stated that without seeing exactly how the load looked before the decedent departed, he could not say how the load looked to the decedent. On cross-examination, Officer Lane stated that if a driver is familiar with the equipment and with the cargo he is hauling, it is unlikely that he would mistake a pallet or a skid for a nailer. Officer Lane indicated that photos from the scene depicted pallets that he would not mistake for nailers.
 {¶ 28} John Moore ("Moore"), has been the general operations manager for PDQ since April 2000. He has a commercial driver's license and has transported batteries like those that the decedent was transporting on the day of the accident. He has training in federal motor carrier regulations and has experience with load shifts. Moore testified that the decedent had been employed with PDQ since September or October 2000. PDQ did not provide formal training in motor carrier regulations, but gave each driver the most current issue of the federal motor carrier regulation book. He stated that drivers receive training on how loads are to be secured through their everyday, on-the-job work experience.
 {¶ 29} Moore has seen many loads of appellee's batteries arrive at PDQ's Grove City location and, contrary to Smith's and Robson's testimony, Moore stated that appellee's loads were typically secured with two-by-four blocks and nailers, and that the battery cabinets would usually be situated in a staggered, zig-zag pattern, not lined up down the middle of the trailer. He stated that the manner of loading that Smith and Robson described was not a safe procedure. He also testified, however, that given the decedent's experience, Moore would expect the decedent to be able to tell by looking at a load whether it was properly secured. He stated that part of a driver's responsibility is to open the doors of the trailer and examine the load.
 {¶ 30} Moore testified that PDQ provided all drivers, including the decedent, with blocking apparatus to secure loads in the event drivers felt such was required. He stated that federal regulations and PDQ's policy prohibit drivers from moving a load that is not properly secured, and that the decedent was very familiar with appellee's products and how they should be loaded. He stated that even if the load was situated as Smith and Robson had described, the decedent would have had three to four feet on either side of the batteries in which to walk up and down to inspect how each battery was secured.
 {¶ 31} John Toth ("Toth"), was formerly the general manager of PDQ and has a commercial driver's license. He recalled that the decedent was a good employee. The only formal instruction that PDQ gave the decedent regarding how to secure a load was giving him a copy of the federal regulations handbook, but he recalled that the decedent brought 10 years of commercial truck driving experience with him to his employment with PDQ.
 {¶ 32} Toth testified that he had never personally seen a load of battery units running down the middle of a trailer, but if such was the case he would expect the use of a rear strap, but would not expect the batteries to be blocked and nailed because, he said, he would expect that they would be too heavy to shift in transit. On direct examination, he noted that the tractor-trailer involved in the accident had passed an earlier mechanical inspection and had no problems with its suspension or brakes, but acknowledged on cross-examination that it would not be possible, after the accident, to determine whether all parts of the truck's suspension were in good working order immediately before the accident.
 {¶ 33} Toth stated that the decedent was a qualified commercial truck driver who knew how to examine loads and to determine whether they were properly secured. He explained that PDQ's protocol required that if the decedent was unsatisfied with the way a load was secured, he should contact appellee and if he was unable to do so, or appellee was unable to get the load properly secured, he should leave the trailer at appellee's facility and refuse to haul it. It is PDQ policy that drivers are responsible for the safety and security of their loads, they must visually inspect each load, and they may not move a load until they are satisfied that it is safely secured. Toth testified that every PDQ driver is issued straps and that one driver alone can secure a load with straps; one does not need to move the cargo around in order to do so.
 {¶ 34} When asked whether the decedent was right to haul the load in question on the date of the accident, Toth responded that it was the decedent's decision to make, but that he, too, would have hauled the load because he would have thought that the battery cabinets would not shift due to their weight.
 {¶ 35} Phillip Haskins ("Haskins"), has been an inspector with the Transportation Department of the Public Utilities Commission of Ohio ("PUCO") for 19 years. His duties include the inspection of transport vehicles and shipping facilities. He has investigated 100 to 200 motor vehicle accidents, 75 percent of which involved tractor-trailers. He also investigated the decedent's accident. Prior to the decedent's accident, Haskins had seen other accidents with load configurations similar to the one that Smith and Robson reportedly used.
 {¶ 36} As a result of his investigation, Haskins issued a report to the PUCO's compliance division, which resulted in the issuance to appellee of a "Notice of Apparent Violation" which, Haskins explained, means that there may have been a violation of a regulation pertaining to loading. However, upon further review, the PUCO ultimately did not issue a violation or impose a penalty because a compliance officer determined that appellee should not be penalized because "the driver actually handled the product for them. The inspection report supported [appellee's] position." (Exh. 1, Dec. 20, 2002 Memorandum).
 {¶ 37} Haskins confirmed that when he conducted his investigation he could not say whether there had been any violation of regulations governing safe loading. After speaking with Dalton regarding the way in which appellee's employees stated the load was placed, Haskins concluded that this manner of loading could have been in compliance with regulations for normal transportation. Later on in his testimony he stated that the load configuration was indeed in compliance with applicable regulations.
 {¶ 38} Haskins stated that he could not say whether a load shift was the primary cause of the decedent's accident, but stated that a load shift could have been a contributory factor. However, he, too, confirmed that it is the driver's responsibility to ensure that a load is secured properly and safely.
 {¶ 39} Jeffrey C. Bookwalter ("Bookwalter"), is a mechanical engineer with SEA, Ltd. He has been in the business of vehicle accident analysis for 24 years and has conducted 250 to 300 accident reconstructions. He opined that a cargo shift caused the severe leftward lean that the police recruits reported seeing prior to the decedent's accident. He stated that if blocks and nailers had been used, the cargo might not have slid, but would have instead tipped over.
 {¶ 40} From the descriptions given by the recruits, Bookwalter determined that the truck was leaning at a 12-degree angle. The trailer was equipped with an air-ride suspension. The per-axle roll resistance rate for an air-ride suspension is between 54,000 and 180,000 inch-pounds per degree. Taking into consideration the weight of the load and the description given by the recruits, Bookwalter determined that the load had shifted almost completely to the left side of the trailer by the time the accident occurred.
 {¶ 41} Applying what is known as the "Limpert Formula," which determines how much lateral acceleration is required to tip a vehicle over, Bookwalter determined that once the load shifted, the decedent's truck would have tipped over while traveling on the ramp at between 26 and 39 miles per hour. Bookwalter also determined that if the load hadnot shifted from center, the trailer would not have tipped over until it was traveling at between 50.5 and 56.5 miles per hour. He acknowledged, on cross-examination, that he cannot say what caused the load to shift (e.g., improper loading, or problems with the truck's suspension, "fifth wheel," tires, etc.) He can only say how much force would have caused it to shift.
 {¶ 42} Also on cross-examination, defense counsel asked Bookwalter to elaborate on the issue of the load tipping versus sliding. Bookwalter described a calculation using the static coefficient of friction of a dry oak pallet against a dry oak trailer floor. He stated that while it would take a force of .35 G's for the decedent's tractor-trailer to roll over with the load centered, the load wouldn't have moved off-center until a force of .54 G's was applied. Thus, he admitted, with the load initially positioned as Smith and Robson claimed, a lateral force would have tipped the decedent's truck over before it would have caused a load shift. (Tr. 462.) This testimony served to disprove at best, or call into question at least, the theory that the load shifted at all.
 {¶ 43} However, the trial court did not place great emphasis on this testimony because it determined that, under Fernandez, supra, assuming that appellee's failure to use nailers does constitute a defect, and assuming that a load shift did occur as a result of this alleged defect, the decedent was responsible for ensuring that the load was safe and secure so long as he had access to the load in order to inspect it and the defect was discoverable upon a reasonable inspection. The court determined that, viewing the evidence in the light most favorable to appellant, reasonable minds could only conclude that the decedent indeed had access to the load in order to inspect it, and that a reasonable inspection would have revealed that nailers had not been used.
 {¶ 44} Thus, on appeal, the parties' arguments focus on whether there was sufficient evidence to permit reasonable minds to conclude that the alleged defect (the lack of nailers) was latent and concealed and would not have been discovered in the course of a reasonable inspection.
 {¶ 45} Some courts have held that what is patent and obvious in an ordinary inspection depends, in part, upon the experience of the observer. See Alitalia v. Arrow Trucking Co. (D.Ariz. 1997),977 F.Supp. 973, 984; see, also, Decker v. New England Public Warehouse, Inc.,2000 ME 76, 749 A.2d 762, 812; Smith v. Northern Dewatering, Inc. (D.Minn. 2004), 2004 U.S. Dist. LEXIS 2648, at *8; Ebasco Services, Inc. v.Pacific Intermountain Express Co. (S.D.NY 1975), 398 F.Supp. 565.
 {¶ 46} In the instant case, appellant argues that a jury could reasonably conclude from the evidence that the decedent would not have discovered the alleged defect through a reasonable inspection, and bases this argument on three categories of evidence: (1) testimony that the decedent did not receive formal instruction from PDQ as to how to secure loads, (2) testimony that appellee had secured batteries with wood nailers in the past, and (3) Officer Lane's testimony that the decedent could have mistaken pallets for wood nailers and Dalton's testimony that he himself mistook the pallets for nailers when he inspected the load following the accident.
 {¶ 47} First, though Moore answered in the negative when appellant's counsel inquired whether PDQ had provided the decedent with "formal training" on how to secure loads, he also testified that drivers receive on-the-job training daily as to how to secure loads. The evidence disclosed that the decedent had hauled loads of batteries and UPS units from appellee's Delaware facility on an almost daily basis for one year and had an additional ten years of commercial truck driving experience prior to his employment with PDQ. Thus, he had a great deal of experience both in securing loads and preventing load shifts generally, and in securing loads of cargo from appellee's Delaware facility in particular. Toth recalled that the decedent was an excellent employee and was a qualified commercial truck driver who knew how to examine loads and to determine whether they were properly secured. The evidence was insufficient for reasonable minds to conclude that the decedent lacked the requisite experience to ascertain whether the load was properly secured.
 {¶ 48} Next, although Moore testified he had seen many loads of appellee's batteries arrive at PDQ, and that they were typically secured with nailers, he did not specify how many of those loads came from appellee's Delaware facility (the evidence demonstrated that PDQ hauled different appellee-produced products from facilities around the country), and he also did not specify whether they arrived with nailers because appellee's shipping personnel loaded them that way, or whether individual drivers had braced the loads themselves, as they were equipped to do if they saw fit. There was no evidence that Moore had picked up any loads at appellee's Delaware facility. Moreover, Toth testified that he would not have expected appellee's shipping personnel to have used nailers on the decedent's load. The evidence was insufficient for reasonable minds to conclude that the decedent would or should have assumed that appellee's personnel had used nailers to secure the load. In any event, the testimony demonstrated that it is the driver's responsibility, both as a matter of federal law and PDQ policy, to inspect each and every load and to assure himself that it is properly secured for safe transit.
 {¶ 49} The evidence was likewise insufficient for reasonable minds to conclude that, upon a reasonable inspection, the decedent would not have been able to tell the difference between pallets and nailers. It was undisputed that there was enough room for the decedent to have walked the entire length of the trailer on both sides of the cargo to determine whether and how the load was secured. The crash occurred at 3:48 p.m. and the lighting conditions were listed on the police report as "daylight." This means that the decedent had the benefit of daylight in which to inspect the cargo when he picked up the trailer. There was no evidence that anything obstructed his view of the cargo.
 {¶ 50} The fact that Dalton confused the pallets with nailers is not surprising, given that he has never been a truck driver and when he arrived at the scene it was dark and the interior of the trailer had been torn and splintered. His confusion, however, does not lend support to appellant's argument that the decedent suffered from the same confusion. As Officer Lane stated, whether such a mistake is possible depends greatly on the familiarity that the driver has with the cargo being hauled. The decedent had extensive familiarity with this product, he had over 11 years of experience as a truck driver and it was daylight when he retrieved the trailer.
 {¶ 51} When Officer Lane was asked the hypothetical question whether "someone" could mistake the pallets for nailers, he stated that it was "possible" but when shown photographs of appellee's equipment after it was offloaded from the wreck, he stated that he would not have mistaken the pallets for nailers. There was no evidence that, despite his extensive experience in the commercial trucking industry, the decedent could not likewise tell the difference between the two.
 {¶ 52} Upon a thorough review of the evidence, and viewing the same in the light most favorable to appellant, we agree with the trial court's conclusion that any defect in the way in which appellee's agents loaded the cargo in the decedent's trailer was not latent and concealed, and would have been discernable by the decedent upon an ordinary inspection.
 {¶ 53} Appellant argues that even if the decedent was negligent, the case should have been sent to the jury with instructions to undertake a comparative negligence analysis. Appellant does not provide, and we are not aware of, any authority to support this proposition. In accordance with this court's decision in Fernandez, and the federal authorities it adopts, there is no basis for a comparative negligence analysis. Appellee is only liable for latent and concealed defects. The evidence being insufficient as a matter of law to demonstrate the existence of a latent and concealed defect, the directed verdict was properly granted.
 {¶ 54} For all of the foregoing reasons, appellant's single assignment of error is overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed. BROWN and KLATT, JJ., concur.